**State of Vermont v. Jeffrey Patnaude**

**State of Vermont v. Ellwin Poquette**

[438 A.2d 402]

Nos. 230-80, 231-80

Present: Barney, C.J., Larrow, Billings, Hill and Underwood, JJ.

Opinion Filed November 3, 1981

---

*Mark J. Keller,* Chittenden County State's Attorney, and *Susan R. Via,* Chief Deputy State's Attorney, Burlington, for Plaintiff.

*William A. Nelson,* Acting Defender General, and *Ruth Ann Wishik,* Law Clerk (On the Brief), Montpelier, for Defendants.

**Underwood, J.** The two defendants and three other men were accused by two women of repeated sexual assaults upon them in a late-night gang rape at a secluded cabin in Williston. Following combined trials, a jury found both defendants guilty of sexual assault, 13 V.S.A. § 3252(1)(A), upon each of the women.

The defendants moved for acquittals, notwithstanding the verdicts, and for new trials on the ground that the trial judge's evidentiary rulings deprived them of a fair trial. These motions were denied and judgments of conviction entered. It is from these judgments the defendants appeal.

On the evening of November 5, 1979, the two prosecuting witnesses hitchhiked from their Waterbury homes to Burlington. After playing foosball in a Main Street ice cream parlor, one of the women recognized the defendants standing out front on the sidewalk with two other men. After a short conversation, the men agreed to give the women a ride home to Waterbury. A girl friend of the two women joined them.

The three women entered the car and the four men drove to get some beer. They then started making passes at the women and tried to convince them to "party." All three resisted these overtures. The men then agreed to take them directly home. Instead, they dropped one off at Battery Park and then drove the other two to a remote cabin in Williston near the Winooski River. Another man was already at the cabin when they arrived.

The two defendants and the other three men forcibly ripped the clothes from the women and forced each to engage in repeated sexual intercourse, fellatio and cunnilingus. At one point, defendant Patnaude pulled a hunting knife from its sheath and threatened to cut off one of the women's breasts if she did not comply with all the demands of all of the men. Her companion finally escaped. She ran down a bank and waded across the river to refuge at the first house she came upon. She was shaking, crying and hysterical, and told the occupants she had been raped.

Fear of defendant Patnaude's hunting knife kept the other woman at the cabin. Eventually she was driven from the cabin by car and dropped off at the edge of the Interstate Highway. A truck driver gave her a ride to her home in Waterbury. She

did not tell the truck driver she had been raped. Both women, however, gave detailed reports of the incident to police.

Defendants admit participating in genital and oral sex with the two women that evening. Their defense is that the women consented. To support their theory, the defendants offered to produce witnesses and sought permission to cross-examine the State's witnesses about prior sexual conduct between the two women and third persons. The trial judge excluded this evidence, relying on 13 V.S.A. § 3255(a)(3). The defendants brief three claims that the judge's decision constituted reversible error.

## I.

Defendants' first claim of reversible error is that 13 V.S.A. § 3255(a)(3), the rape-victim shield provision of the sexual assault act, 13 V.S.A. Chapter 72, is overbroad and therefore facially unconstitutional. That section provides:

> Evidence of prior sexual conduct of the complaining witness shall not be admitted; provided, however, where it bears on the credibility of the complaining witness or it is material to a fact at issue and its probative value outweighs its private character, the court may admit:
> (A) Evidence of the complaining witness' past sexual conduct with the defendant;
> (B) Evidence of specific instances of the complaining witness' sexual conduct showing the source of origin of semen, pregnancy or disease;
> (C) Evidence of specific instances of the complaining witness' past false allegations of violations of this chapter.

13 V.S.A. § 3255(a)(3).

Defendants claim to have discovered a category of evidence of the complaining witness' past sexual conduct with third persons which is legally relevant, but excluded by 13 V.S.A. § 3255(a)(3). A proper weighing of the State's interests in excluding such evidence and the defendant's Sixth Amendment rights in having it admitted, would, they say, require that the evidence be admitted. Since the statute categorically bars all prior sexual conduct evidence which does not fall

within one of its three exceptions, thereby excluding evidence which the defendants are constitutionally entitled to introduce, they contend that it is overbroad and thus unconstitutional on its face.

Defendants raise the issue of facial constitutionality for the first time in this Court. In fact, at the pretrial in camera hearing, held pursuant to 13 V.S.A. § 3255(b), to determine the admissibility of ten separate items of defense evidence, defense counsel specifically assured the trial judge that they were not seeking to have 13 V.S.A. § 3255(a)(3) stricken as unconstitutional. Rather, they told the judge that if, as he weighed the probative value of the evidence against its "private character," he found a conflict between the State's interests in the rape victim shield law and the defendants' Sixth Amendment rights to introduce legally relevant information, the statute, in this particular case, must yield.

■■ Notwithstanding that the statute is supported by a presumption of constitutionality, *State* v. *Shop & Save Food Markets, Inc.*, 138 Vt. 332, 334, 415 A.2d 235, 236 (1980), we have repeatedly held that constitutional issues which were not raised in the trial court will not be considered here. *State* v. *Prue*, 138 Vt. 331, 331–32, 415 A.2d 234 (1980). Further, even though constitutional issues have been argued and briefed, they will not be considered by this Court unless disposition of the case requires it. *In re Wildlife Wonderland, Inc.*, 133 Vt. 507, 520, 346 A.2d 645, 653 (1975). Defendants' assertion of unconstitutionality depends on two assumptions: (1) that the category of evidence they offer is legally relevant; and (2) that 13 V.S.A. § 3255(a)(3)'s standard for admissibility differs from the traditional tests for legal relevance. Given our holdings below that evidence of a complaining witness' past sexual conduct with third persons is not legally relevant for defendants' purposes, and that 13 V.S.A. § 3255(a)(3) calls for the application of the traditional test for legal relevance, we need not reach the issue of facial unconstitutionality to dispose of this appeal.

## II.

Defendants further claim that the trial judge applied the rape victim shield provisions of the sexual assault act in an un-

constitutional manner. More specifically, they insist that the Sixth Amendment gives them the right to introduce all legally relevant evidence. The judge excluded evidence of the victims' past sexual conduct with third persons by weighing its probative value, or logical relevancy, against its "private character" as required by 13 V.S.A. § 3255(a)(3). Defendants say he should have used the traditional standard for legal relevancy which weighs probative value against "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *State* v. *Gardner*, 139 Vt. 456, 459, 433 A.2d 249, 251 (1981); *Quazzo* v. *Quazzo*, 136 Vt. 107, 110, 386 A.2d 638, 640 (1978); *State* v. *Davis*, 132 Vt. 290, 293, 318 A.2d 664, 665–66 (1974). Since the "private character" standard of 13 V.S.A. § 3255(a)(3) excludes evidence which is legally relevant under the traditional standard embodied in the Federal Rules of Evidence and Vermont cases, defendants say, the law was unconstitutional as applied.

■■ It is hornbook law that the Sixth Amendment, which is applicable to the states through the Fourteenth Amendment, *Pointer* v. *Texas*, 380 U.S. 400 (1965), guarantees the rights of an accused in a criminal prosecution "to be confronted with the witnesses against him" and "to have compulsory process for obtaining Witnesses in his favor." U.S. Const. Amend. VI. Defendants concede these rights are not absolute, but contend that in a face-off, the interest of the State and victim in excluding certain evidence of a "private character" must yield to the defendants' constitutional right of confrontation. They rely heavily upon *Davis* v. *Alaska*, 415 U.S. 308 (1974), and *Chambers* v. *Mississippi*, 410 U.S. 284 (1973), to support their position.

Those cases, however, do not help the defendants. In both cases, the evidence excluded was legally relevant, and the Supreme Court emphasized its importance to the defendants' cases. Further, both cases make clear that even legally relevant evidence is not automatically admissible without regard to the State's interest. In *Chambers, supra*, 410 U.S. at 295, the Court stressed:

> Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.

And in *Davis,* the Court balanced the State's interests against the interests of the criminal defendant and found, on the facts of that case, that the State's policy of protecting juvenile offenders from public exposure was "outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness." *Davis, supra,* 415 U.S. at 319.

It is readily apparent from a reading of these and other cases relied upon by the defendants that the Supreme Court, when called upon to determine whether a compelling state interest must yield to a defendant's constitutional right of confrontation, has decided the issue on the facts and circumstances of the particular case after a close examination of the competing interests.

Defendants' evidence, however, does not advance even to this stage. They are not entitled to a weighing of their interests against those of the State unless their evidence passes the tests of logical and then of legal relevancy. The evidence they offer does neither.

## A.

■ Logically relevant evidence, or evidence with some probative value, is information "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

■■ As a general rule, courts do not allow parties to prove that a person did the thing in question by proving that he or she had in the past done a similar thing. Some special relationship indicating a connection beyond mere similarity as to some particulars has been required. Thus, this Court has long held in commercial transactions, *Phelps, Dodge & Co.* v. *C. B. Conant & Co.,* 30 Vt. 277, 284 (1858) ; *H. M. Farnham & Sons, Inc.* v. *Wark,* 99 Vt. 446, 450, 134 A. 603, 605 (1926) ; in tort actions, *Loomis* v. *Abelson,* 101 Vt. 459, 461, 144 A. 378,

379 (1929); *Melford* v. *S. V. Rossi Construction Co.*, 130 Vt. 148, 150, 287 A.2d 577, 580 (1972); and in criminal cases, *State* v. *Lapan*, 101 Vt. 124, 140, 141 A. 686, 694 (1928), that past conduct cannot be admitted into evidence to prove present conduct in conformity with it. "[B]ecause a person does a thing once, or does it in a certain way, this is no evidence that he does the same thing or does it in the same way on another occasion." *H. M. Farnham & Sons, Inc.* v. *Wark, supra*, 99 Vt. at 450, 134 A. at 605.

██ To have one fact prove another, there must be a necessary or probable connection between the two. Inferences cannot be drawn from one transaction to another that is not specifically connected with it merely because the two resemble each other. They must be linked together by the chain of cause and effect, in some assignable way, before the existence of one of the transactions will support an inference about the nature of the other. *Jones* v. *Jones Estate*, 121 Vt. 111, 116, 149 A.2d 738, 742 (1959).

Similarly, Wigmore maintains that "there can never be a direct inference from an act of former conduct to the act charged . . . . Human action being infinitely varied, there is no adequate probative connection between the two. A [person] may do the act once, and may never do it again; and not only may he not do it again, but it is in no degree probable that he will do it again. The conceivable contingencies that may intervene are too numerous." 1 J. Wigmore, Evidence § 192 (1923).

Although historically courts inside and outside of Vermont as well as prominent authorities all agreed that it was ordinarily without probative value, a cause and effect relationship was manufactured to allow such evidence in against rape victims. Prior acts of sexual conduct were admitted to prove that the prosecuting witness consented to the sexual act at issue in the trial, and to impeach her credibility. Vermont decisions illustrate the fallacious reasoning used to provide the necessary causal connection between prior sexual conduct and the incident in question:

> [S]uch testimony is competent, not merely for the purpose of impeaching her general character for truth, but to show on her part, a corrupted mind, from which her con-

sent to such an act is the natural result of her inclinations.

*State* v. *Johnson,* 28 Vt. 512, 514 (1856).

The jury would be less ready to conclude that a woman, who had once improperly yielded, afterwards properly resisted, than they would if she had been a woman of unquestioned virtue.

*State* v. *Reed,* 39 Vt. 417, 419 (1867), *reaffirmed in State* v. *Hollenbeck,* 67 Vt. 34, 35, 30 A. 696, 697 (1894).

Before our sexual assault act, two trials were in progress at the same time. In nearly every rape case, the prosecutor put the assailant on trial and the defense counsel put the rape victim on trial. It was considered fair game, in a profession dominated by male chauvinism and, formerly, by juries composed of men, to permit defense counsel to inquire into chastity. The process of "reasoning" which connected past acts with the present was that an instance of past consensual sex is evidence of unchastity, unchaste women are immoral, and immoral women are more likely to consent to sexual activity on any given occasion, and to lie about whether or not they consented. If proven unchaste, a woman was thought to somehow be less believable than a virtuous woman. See, e.g., Ordover, *Admissibility of Patterns of Similar Sexual Conduct: The Unlamented Death of Character for Chastity,* 63 Cornell L. Rev. 90, 95–99 (1977). In short it was felt by many that an unchaste woman could not be raped. Fearful that an innocent man would be falsely accused of rape by a woman who initially provoked the incident, men adjusted the law to meet the threat.

Perjury became rife in the defense of a rape case. The defendant would call upon his friends to testify, one after another, that they each had engaged in consensual sexual intercourse with the complaining witness on prior occasions. Perhaps the defendant Patnaude was referring to such practices when he first denied the accusations of sexual assault upon the two prosecuting witnesses and then told the state trooper that: "We're innocent, and I know of an old way of getting out of it."

The law of evidence prevailing prior to the present statute meant that rape victims had to bear not only the trauma of the rape itself, but face the ordeal of baring their private lives, and risk, in the figurative sense, being falsely branded with a scarlet letter on the forehead. As a result, most women shied away from reporting and prosecuting the crimes committed against them. Rape is today the least reported crime. Estimates are that only one rape in ten is ever reported. 124 Cong. Record H11944.

Vermont's sexual assault act, 13 V.S.A. Chapter 72, together with 13 V.S.A. § 3255(a)(3), which is an integral part of it, was enacted in 1977. It is modeled after the Michigan criminal sexual conduct act. The rape victim shield provision of the act represents an explicit legislative decision to eliminate trial practices under our former rape law that had effectively frustrated society's vital interest in the prosecution of sex crimes. The legislature, in enacting the rape victim shield law, rejected the former view that in rape, unlike all other areas of the law, past acts prove the existence of a corrupt mind which inclines the witness to automatic consent on all occasions. The notion that an unchaste woman cannot be raped has been wholly rejected.

Even a prostitute should have a right to choose. *State* v. *Gardner*, 59 Ohio St. 2d 14, 391 N.E.2d 337 (1979). "The mere fact that the prosecutrix may have had sexual relations with a third person on one occasion does not prove that she gave her consent to the act of intercourse with the respondent. *Consent is purely a mental process.*" (Emphasis supplied.) *State* v. *Jackson*, 126 Vt. 250, 256, 227 A.2d 280, 284 (1967).

The restrictions on the admissibility of certain evidence imposed by the rape victim shield law will encourage reluctant rape victims to come forward and report the crime, encourage these same victims to testify in court against their assailant, and produce more prosecutions and convictions, and thus be a greater deterrent. These restrictions screen the rape victim from unnecessary indignities and needless probing into her past sexual history. The physical and emotional trauma of the incident are severe enough without aggravating the situation by putting the victim herself on trial for prior sexual inti-

macies with persons other than the assailant or for incidents which never happened.

The legislature wanted to insure that a rape trial is ·conducted in the same manner as other criminal trials, and that it does not veer from an impartial examination of the accused's conduct on the date in question to an inquisition in which the rape victim is required to acknowledge and justify her sexual past. Hearing on S. 34 before the Vermont Senate Judiciary Committee, 1977 Session.

By excluding worthless evidence, the legislature increased the reliability of the judicial system, increased the number of rapes actually reported and made it less likely that highly inflammatory information with no logical connection to the issues at trial would bring about unwarranted acquittals. Since the information excluded is without probative value to begin with, no harm can befall innocent defendants.

Vermont is not alone in recognizing that the reasoning process used to justify proving present conduct by past acts was devoid of logic, and merely masked the forbidden practice of reasoning directly from one act to another. Forty-five of the fifty states, as well as the federal government, have now passed rape victim shield laws which restrict or exclude certain types of evidence. Tanford & Bocchino, *Rape Victim Shield Laws and the Sixth Amendment*, 128 U. Pa. L. R. 544 (1980). The Vermont rape victim shield law merely standardizes the law of evidence. It brings the rules governing the admissibility of past act evidence in rape cases into conformity with the evidentiary rules in effect for the rest of the law. We turn now to consider how the defendants' evidence fares under those rules.

### B.

Defendants offered 10 items of evidence of the victims' past sexual conduct at the pretrial in camera hearing. Five items were ruled admissible and five, all occurring in 1979, were excluded under 13 V.S.A. § 3255(a)(3). Two of the excluded incidents involved group sexual conduct between one or both of the prosecuting witnesses and third persons. On one occasion,

beneath a "rock and roll" amusement ride at the Champlain Valley Fair, one of the prosecuting witnesses and her male companion and another couple are alleged to have engaged in sexual intercourse and then swapped partners. She is alleged to have also performed fellatio on one or both of the men. On another occasion, the two prosecuting witnesses are alleged to have engaged in group sexual activities with two men in an apartment in Waterbury.

In addition to the two instances of alleged group sex, defendants also offered evidence of two incidents involving the exchange of sexual favors for minor considerations. In one such incident, one of the women was alleged to have had sexual intercourse with a man for $10 or $15 in a field known as "69 Acres" near the Winooski River. In the other incident, that same woman was alleged to have had sexual intercourse with and performed fellatio upon a tattoo artist in exchange for two tattoos—one on her arm and one over her breast. The fifth incident involved both group sex and sex for minor consideration. A witness was offered to testify that the two prosecuting witnesses invited her to join them at a party in Waterbury and told her that she might make some money in exchange for performing sexual favors.

The defendants maintain that evidence of group sexual conduct and sex for favors is logically relevant on the issues of consent, motive and credibility of the witnesses, and that its probative value outweighs its prejudicial impact.

▆▆ The defendants concede that it is the weight of authority that prior acts of sexual conduct by the prosecuting witness with third persons are inadmissible to show consent, motive or credibility. *People* v. *Mikula,* 84 Mich. App. 108, 115–16, 269 N.W.2d 195, 199 (1978); *People* v. *McKenna,* 196 Colo. 367, 371–72, 585 P.2d 275, 278 (1978); *In re Nichols,* 2 Kan. App. 2d 431, 580 P.2d 1370, 1374–75 (1978); *Commonwealth* v. *McKay,* 363 Mass. 220, 226, 294 N.E.2d 213, 218 (1973). See also Annot., 94 A.L.R.3d 257 (1979). They seek to convince us, however, that their use of the evidence is unique, was not contemplated by the general rule, and is so compelling as to warrant our carving out an exception to the limitations imposed by the rape victim shield law. The defendants argue that evidence of prior group sex by these two

women illustrates a "pattern of similar conduct" which supports the defendants' version of the events.

The defendants are adamant that this evidence is legally relevant under the traditional standard embodied in Rule 403 of the Federal Rules of Evidence. The trial judge excluded it, they say, because he applied the "private character" standard of 13 V.S.A. § 3255(a)(3), which lets in less evidence than the traditional standard.

We must first determine whether the "private character" test envisioned by the rape victim shield law in fact is different from the traditional test of legal relevance envisioned by Federal Rule of Evidence 403 and Vermont case law, *State v. Gardner, supra; Quazzo v. Quazzo, supra; State v. Davis, supra*. We conclude that the "private character" test for sexual assault cases, set forth in the rape victim shield law, is synonymous with the traditional tests for legal relevance admissible generally in criminal and civil trials.

Past sexual conduct is unique among the varieties of past conduct with which the law customarily deals. It is peculiarly private in character, reflecting, when consensual, personal moral values or some level of commitment or expression of sentiment between participants. In part because of its intimacy, and in part because reasonable members of our society differ greatly in their judgments about the propriety of different types of sexual conduct, such information presents great potential danger when placed in evidence in a rape trial. It raises very real possibilities that some jurors will find the conduct of a rape victim so alien to their own experience and morals, and so offensive, that they will be unable to comprehend how such a person could be raped. Similarly, the introduction of such evidence runs the risk of turning the trial from an impartial examination of the incident in question to an inflammatory and titillating inquiry into irrelevant pages of the victim's life, confusing the issues and misleading the jury.

Among the purposes expressly given by the legislature for enacting the rape victim shield law was to protect victims from an inquisition into their past sexual conduct, and to treat past conduct evidence uniformly, whether in rape

cases or in the law generally. Hearings on S. 34 before the Vermont Senate Judiciary Committee, 1977 Session. These two purposes were reflected in the test mandated by 13 V.S.A. § 3255(a)(3), requiring that probative value be weighed against the "private character" of the evidence. The trial judge appears to have assumed that the "private character" test is something different from the traditional test for legal relevancy. In fact, however, the "private character" test is a specific application of the general test of legal relevancy. It is the private character of past sexual conduct which, in this specific context, produces the evidentiary mischief that the traditional test for legal relevancy is designed to prevent, *i.e.*, the danger of unfair prejudice, confusion of the issues, of misleading the jury, or miring the court in collateral issues. The legislature was required to enact a special law on the subject to end abuses caused by the common law's failure to treat rape as it treated other criminal prosecutions. Thus 13 V.S.A. § 3255(a)(3) is merely the application of the general rule that past conduct is not admissible to prove present conduct to the specific circumstances of rape, where the "private character" of the past sexual conduct is responsible for the harm which would result if such evidence were admitted.

To the extent that the trial judge read into the "private character" standard some meaning other than the traditional "prejudicial impact" test for legal relevancy, he was in error. However, a trial court can achieve the right results for the wrong reasons. *Gilwee* v. *Town of Barre*, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980). Thus we must consider whether the logical relevance of the proffered evidence outweighed its prejudicial impact, or, in the specific context of rape, its "private character."

## C.

 Defendants concede that they have no right to have irrelevant or inflammatory evidence admitted. "[O]therwise admissible evidence may become inadmissible where its probative value is overwhelmed by it probable improper prejudicial effect." *State* v. *Davis, supra*, 132 Vt. at 293, 318 A.2d at 665–66; *Quazzo* v. *Quazzo, supra*, 136 Vt. at 110, 386 A.2d at 640. They argue, however, that there is a logical nexus between the prior group sex activities of these complaining witnesses

and their sexual conduct on the night in question, which is of such great probative value that it must, of necessity, outweigh any possible prejudicial effect. They call our attention to *State* v. *Murphy*, 134 Vt. 106, 353 A.2d 346 (1976), as an indication that we have condoned the admissibility of such evidence.

It should be noted, however, that the defendant in the *Murphy* case did not attempt to offer evidence of a prior group masturbation incident, in which the 11-year-old complaining witness, two boys and another girl were involved, to prove present conduct in conformity therewith. Nor was he trying to prove that because she was unchaste she would be less believable. This was a statutory rape charge so that consent was not even an issue in the case. The prior incident was offered to rebut evidence that the defendant had bruised the hymen of a young girl during a rape. He offered the evidence to prove that the injury could have been caused by the prior incident, and thus support his claim of innocence. We held on those facts that it was error to exclude that evidence from jury consideration. That holding was perfectly consistent with our long line of cases in all other areas of the law, alluded to earlier, which hold that two transactions must be "linked together by the chain of cause and effect in some assignable way" or that there must be "a necessary or probable connection between the two." *Jones* v. *Jones Estate, supra,* 121 Vt. at 116, 149 A.2d at 742.

 Defendants, however, say their evidence is for an entirely different purpose than proving present conduct by similar past conduct. In the ordinary case, such evidence completely lacks the causal connection which we require. Consent to sexual conduct with one person has no tendency to prove consent to conduct with another. Defendants argue that though isolated incidents lack probative value, there exists some threshold beyond which repeated recurrences illustrate a pattern of behavior which supports the inferences that isolated incidents will not support.

 This Court has not recognized such a threshold in other areas of the law. Our cases recognize no distinction between the probative value of isolated instances and of regular recurrences amounting to custom, habit or a pattern. See, e.g,

*H. M. Farnham & Sons, Inc.* v. *Wark, supra,* 99 Vt. at 450, 134 A. at 605. Neither is ordinarily admissible. Further, even if such a threshold existed, defendants have not crossed it. Not only are there insufficient prior instances to constitute a pattern, but what instances exist are not similar. Prior instances of *menage a trois,* or couples swapping, are certainly not similar to the incident on the night of November 5, 1979, when five men physically overpowered and intimidated these two women and forced their victims to comply with their every whim in repeated and prolonged sexual assaults upon them.

Finally, even if there were sufficient numbers of similar instances to demonstrate a pattern of habitual consent, such evidence would be without probative value for the purpose offered.

> The probative force of habit, whether the question arises in a civil or criminal case, is based principally upon the fact that habitual conduct is largely free from the complicating and confusing element of volition . . . but, on the contrary, brings such conduct in line with the activities of the body which are under the control of the subconscious or subliminal mind, i.e., are of the automatic nature, practically under the uniformity of natural law. In fact, the probative strength of habit is in proportion to the extent to which it assumes this automatic character.

4 C. Chamberlayne, Modern Law of Evidence § 3203, at 4439 (1913).

The issue in this case *is* volition. Did these two women consent *this* time? Only the fact that sexual conduct took place connects the excluded evidence with the events of the night in question. Mere similarity as to some particulars will not suffice to establish probative value. Our evidence law, as previously indicated, requires a special, causal connection between transactions where one is offered to prove some facet of another.

Defendants would supply that missing connection, however, by arguing that their "pattern" evidence establishes the existence of a consensual state of mind, from which we can infer that the victims were likely to have consented to the activities on the night in question. This is, in essence, the same logic

used more than 100 years ago in *State* v. *Johnson, supra,* 28 Vt. at 514, which argued the victim's past sexual conduct was relevant in rape cases to show "a corrupted mind, from which her consent to such an act is the natural result of her inclinations."

Thus, defendants do not offer a new theory, but merely tinker with an old one, which has long been in disrepute. Consent is not an uncontrollable force which, once given, can never be withheld. Each decision to consent is a new act, a choice made on the circumstances prevailing in the present, not governed by the past.

The proffered evidence is worse than worthless. Not only does it have no probative value, but it carries with it the great potential for unfair prejudice, confusion of the issues, and bogging the court down in collateral matters which is characteristic of evidence of past sexual conduct.

The trial judge was correct in excluding it. It was neither logically nor legally relevant for the purposes for which it was offered.

## III.

Lastly defendants contend that the trial judge erred when he permitted the State, in its final argument to the jury, to comment on the defendants' failure to rebut certain evidence offered by the State, because their failure to do so was due, in part, to the restrictions imposed upon them by the trial judge.

It is the defendants' position that the prosecutor knew that the prosecuting witnesses had engaged in several acts of prior group sexual conduct with third persons, and that the trial judge had excluded such evidence, yet they point out the prosecutor was permitted to argue with respect to one of these women as follows:

> They have not impugned her character, they have not maligned her name. They have not dragged her past through the mud. There has been nothing to suggest that [she] . . . was not raped . . . . She had no contact with these defendants before; she would have no reason to engage in this sort of brutal sexual episode that took place.

Record, vol. III, at 508L.

Reference to the transcript indicates that, in context, the quoted argument referred to past contacts between the victims and their assailants. Record, vol. III, at 507L. This particular witness had vehemently denied throughout the trial that she had ever had prior sexual intercourse with any of these five men, ever dated any of them, or even knew who they were.

The prosecutor's statement to the jury was a fair comment on the evidence so far as this witness' prior conduct with any of these defendants. It is within the purview of the rape victim shield law, 13 V.S.A. § 3255(a)(3)(A), for the court to admit evidence of specific instances of the complaining witness' past sexual conduct with the defendants, or either of them. The rulings of the trial judge at the pretrial in camera hearing in no way precluded the defendants from offering evidence of prior sexual conduct of this prosecuting witness with either of them if they had any such evidence.

It was perfectly proper for the prosecutor to ask the jury to draw an unfavorable inference against the defendants for their failure to produce rebutting evidence. In any event, defendants did not object to the remarks when made, did not ask the trial judge to give a cautionary instruction, did not move for a mistrial, and did not raise the issue by motion for a new trial. Issues not raised below will not be considered for the first time in this Court. *State* v. *Lawrence*, 137 Vt. 597, 600, 409 A.2d 997, 999 (1979).

Next the defendants call our attention to a statement of the prosecutor to the jury in rebuttal concerning an opinion by the psychiatrist, Dr. John Grace, with respect to the credibility of the testimony of the other complaining witness. The prosecutor was permitted to argue that:

> Doctor Grace says there isn't any reason to believe that because of her psychological make up, she was prone to lie more than anyone else. That is evidence, that is fact. That evidence has not been rebutted, it has not been disputed by any other facts. You can't escape that.

Dr. Grace had seen her following a suicide attempt on November 29 or 30, 1979, at which time she had told him she had been asked by some friends, who knew of her involvement in

the incident on November 5, 1979, to engage in some sort of group sexual activity and she told him that the request "blew my mind." Defendants claim that if permitted by the trial judge, they would have described the evidence of prior consensual group sex and inquired whether such additional knowledge changed the doctor's opinion of her character for truthfulness.

Our search of the record indicates that Dr. Grace went into great detail in explaining the factual and medical basis for his opinion. Defendants' attorneys were given ample elbow room to attack his credibility on any one or all of the factors he took into consideration, without the need of opening up the private character of this woman's previous sex life.

The limitation imposed by the trial judge upon the cross-examination of Dr. Grace by defense counsel was proper. The prosecutor's arguments to the jury concerning the failure of the defendants even to attack the credibility of Dr. Grace's opinion testimony was fair comment on the evidence.

 Defendants raised this issue only in their motion for a new trial. Whether to grant a new trial is committed to the trial court's discretion and, absent a showing by defendants that the discretion was abused, we will not disturb its decision. *State* v. *Kasper*, 137 Vt. 184, 210, 404 A.2d 85 (1979). No error has been shown.

*Affirmed.*